## Schmid's Administrator v. Louisville & Nashville Railroad Company.

(Decided October 14, 1913).

### Appeal from Boyle Circuit Court.

1. Railroads—Operation—Accidents at Crossings—Lights, Signals and Lookouts From Trains or Cars—Violation of Statute.—Failure to give the signals required by Section 786 Kentucky Statutes, is not gross negligence per se.

2. Negligence—Action—Trial—Question for the Jury.—In an action for death caused by accident at a railroad crossing, whether there is any evidence of gross negligence authorizing award of punitive damages is a question for the court; and whether or not the defendant is guilty of such negligence, is a question for the jury, after the court determines that there is evidence of such negligence.

3. Verdict—Action for Causing Death—Damages—Inadequate Damages.—A verdict for $1,000 for the death of a man 70 or 71 years of age, whose occupation was that of farmer on a small scale and

grape-grower, where the evidence in respect to his earning capacity is not clear, is not flagrantly inadequate.

ROBERT HARDING, EMMET PURYEAR and MORROW & MORROW for appellant.

BENJAMIN D. WARFIELD, JOHN W. RAWLINGS and C. R. McDOWELL for appellee.

OPINION OF THE COURT BY JUDGE HANNAH—Affirming.

John Schmid, a man of about 70 or 71 years of age, was on the 29th day of September, 1911, in the act of passing over a public crossing of the Louisville & Nashville Railroad Company about 400 yards west of Junction City in Boyle County when he was struck by appellee's engine and killed.

His administrator instituted this action to recover damages therefor, and from the judgment rendered upon a verdict in his favor of $1,000, he prosecutes this appeal to this court, asking a reversal; first, upon the ground that the lower court erred in refusing to give to the jury two instructions, known as "B" and "D" in the record, which were asked by appellant and refused by the court; second, upon the ground that the verdict is for a grossly inadequate sum; and third, because of errors in refusing to admit competent evidence and in admitting incompetent evidence.

The instruction "B", offered by appellant and refused by the court, authorized the jury to find compensatory damages for him under a certain state of facts; in lieu thereof, the court gave two instructions authorizing the finding of such damages under certain state of facts: In No. 1, if they should believe from the evidence that appellee "failed to give the statutory warnings, &c.;" and in No. 2, "if the crossing was so dangerous as to require the speed of the train to be reduced, &c."

Under one or both of these instructions the jury found for appellant. Appellant complains of these instructions claiming they were not sufficiently favorable to him; appellee argues that they were each more favorable than appellant was entitled to. However, as appellee has filed no cross appeal and as the jury found for appellant under the instructions given, and we think his rights could not have been prejudiced by the refusal of the court to give instruction "B" asked by him, we deem it unnecessary to comment on the criticisms offered by either appellant or appellee as to the instructions given.

The refusal of the court to give instruction "D," offered by appellant, or a similar instruction on punitive damages, is more seriously complained of by appellant.

Counsel contend that by reason of evidence introduced on behalf of appellant in respect to the failure of the employees of appellee in charge of the engine to give the signals required by the law on approaching the crossing, the question of gross negligence should have been submitted to the jury; and that the jury should have been instructed that if they believed from the evidence that those in charge of the engine were guilty of gross negligence, the jury might in its discretion award appellant punitive damages; in other words appellant's contention is that the failure to give such signals is gross negligence, which under section 6 of the Kentucky Statutes would entitle him to recover punitive damages.

In I. C. R. R. Co. v. Moss' Admr., 142 Ky., 658, this court said, "If the failure to give signals is an evidence of gross negligence, then a punitive damage instruction would be authorized in every case where an accident occurred at a public or private crossing where signals were to be given. This court has not heretofore held that negligence of this character is such as would warrant or justify the court in giving an instruction permitting the jury to award punitive damages." In that case an instruction on punitive damages was given, but this court refused to grant a reversal and direct a new trial on that account, for the reason that as the verdict was for only $2,500, the court was of the opinion that the jury had disregarded the instruction, and that appellant was not thereby injured. It was conceded in that case that the crossing was because of its location a peculiarly dangerous one.

We are cited by counsel to no case holding that the failure to give the signals required by section 786, Kentucky Statutes, constitutes gross negligence per se, as that term is used in section 6, Kentucky Statutes, giving a right of action for death by wrongful act; nor do we understand such to be the law; unless joined with such failure, there are other circumstances of such character that all together they bring the omission charged within the purview of that statute.

In a case of this kind, there may be a recovery of compensatory damages for ordinary negligence; and if the circumstances are such as to bring the case within the purview of that section, there may be a recovery of

punitive damages. Whether there is any evidence of ordinary negligence is a question for the court; whether the defendant is guilty of ordinary negligence is a question for the jury. In like manner, whether there is any evidence of gross negligence is to be determined by the court; and when the court has found that there is some evidence of gross negligence, whether the defendant is guilty thereof is a question for the jury.

The bill of evidence in the record is extensive, but we have carefully examined it and find that the weight of the evidence shows that the locality where this accident happened is not thickly peopled; nor the travel over this crossing great; that the intestate had lived within a few hundred feet of this crossing for many years, owning land on both sides of the railroad; that the engine was running about thirty miles an hour and the accident occurred about the time a regular passenger train was due to pass that crossing. The evidence in respect to the failure to give the statutory signals was not sufficient to authorize an instruction on gross negligence. The trial court was evidently of the opinion that there was no evidence which would warrant the submission of this issue to the jury; and in this we concur.

It is next insisted that the verdict of the jury is inadequate and ignores the evidence in respect to the earning power of deceased. The evidence upon this issue was conflicting. It shows, however, that the deceased was 70 or 71 years of age; and the evidence of his son is about all the evidence presented as to his earning capacity. He says in answer to a question of appellant's attorney that the deceased "had a grape vineyard; he raised grapes; and had two small places besides that that he did some farming on. He made grape juice and sold it; worked in grapes." That "in the working of these farms and his vineyard he was earning anywhere between fifteen hundred and twenty-five hundred dollars per year." The evidence shows that the two little places spoken of by this witness contained some thirty acres and were used mostly for grazing a few head of cattle—five or six; and this son, on cross-examination testified as follows:

"Now, the only business your father was in was kind of overseeing this little place with you and this vineyard, was it?

"A. Yes, sir.

"Q. That is the only business he was in? Now you didn't and you couldn't raise very much more on these little places than your family used, could you, and didn't do it?

Objected to by counsel for plaintiff.

The Court: That you couldn't do it?

Mr. Rawlings: That they didn't raise it, Judge.

The Court: You may answer the question.

To which ruling of the court plaintiff by counsel excepts.

"A. Why, we raised some more than we—

"Q. How much more did you raise on these little places than your family consumed, a year?

Objected to by counsel for plaintiff.

The Court: You may answer.

To which ruling of the court plaintiff by counsel excepts.

"A. I couldn't exactly say.

"Q. Well, about how much? Estimate it to the jury.

"A. Why, we could raise two or three hundred dollars worth there.

"Q. Well, what of?

"A. By raising the crop and then by grazing with the stock and selling the stock.

"Q. You could raise that outside of what you consumed in your family?

"A. Yes, sir.

"Q. How much corn did you get off of that little place over there of ten acres last year?

"A. We didn't have any corn last year.

"Q. How much corn did you get off of this place, the twenty acres by the school house?

"A. Never had it in corn last year.

"What did you get off of that little place last year then?

"A. Well, we grazed about five or six head of cattle in there and we got enough to feed three or four through the winter.

"Q. You didn't sell any of the feed, did you?

"A. Yes, sir.

"Q. How much did you sell?

"A. I don't know—my father sold—

"Q. What did you sell?

"A. Why it was some grass, hay rather.

"Q. How much; about how much?

"A. I don't know.

"Q. About how much grass?

Mr. Harding: We object, if he don't know.

The Court: Go ahead, if you know.

To which ruling of the court plaintiff by counsel excepts.

"Q. About how much grass did you sell?

"A. I don't know. I wasn't there when they sold it.

"Q. Whom did you sell it to?

"A. I don't know. I wasn't there when they sold it.

"Q. What did you sell off of this place (indicating) the twenty acres by the school house?

"A. We grazed that; just took stock and grazed it and put our own stock in it.

"Q. What did you get a month for that you grazed?

"A. I think it was $1.50 on the head.

"Q. How many heads grazed over there?

"A. I don't know how many.

"Q. About how many?

"A. About five or six that was over there; I couldn't exactly say.

"Q. What was done with this grape juice after it was made?

"A. Why, we sold it.

"Q. Ship it out?

"A. Shipped some of it."

Now, the son's statement was, that the only business his father was engaged in was overseeing, with the son, this little place and the vineyard, and they all together could make from the place and the vineyard two or three hundred dollars more than they consumed in any one year; and in determining the earning capacity of the deceased, the jury evidently brought into action some of that sound sense which the law presumes every juror should possess, and which justice demands that he should use. They were not confined to the broad and strong statement of the son that his father was earning from fifteen to twenty-five hundred dollars per year; but they had the right, and it was their duty, to exercise some reasoning power, and from all the evidence think for themselves, and in so doing they evidently concluded and were justified in so doing, that the earning capacity of the deceased was limited. In the case of Stewart's Admr. v. L. & N. R. R. Co., 136 Ky., 717, this court said:

"The value of a piece of machinery is not to be determined by multiplying its present earning power by

the length of its probable use, but the cost of maintenance must be subtracted.   The value of the human machine to his estate must be determined in like manner. It must be maintained—that is, it must be fed, clothed and supplied with other necessities.   What the estate would lose would be the net gain.   There is no precise criterion by which this may be measured; it must necessarily be left to the discretion of the jury.   In the recent case of Netter's Admr. v. Louisville R. R. Co., 121 S. W., 637, we declined to set aside a verdict for $500 for the loss of the life of a child.   It is true the child had no earning power at the time she was killed.   Here, the deceased had an earning power at the time he was killed; but while this simplifies the problem, there are yet many things to be taken into consideration.   As he would grow older, his earning power might become less; he might not remain in the extra-hazardous employment.   There would be certain personal expenses which he would have to meet to earn wages.   How much his estate would lose by his death in the destruction of his power to earn money is, therefore, a question upon which different men might have very different opinions.   He had up to this time saved only $500.   While the verdict of the jury is much less than is often rendered in cases like this, it is for as large a sum as a considerable per cent of laboring men accumulate in a lifetime, and we cannot say that the verdict is so against the evidence as to warrant us in disturbing it.

And in this case, we cannot say that the verdict is so flagrantly against the evidence as to warrant us in disturbing it.

Appellant also complains that the trial court erred in excluding from the jury that part of the evidence of George Read, a witness for appellant, relative to a statement made after the accident by the engineer of the engine which killed deceased, in which the engineer said when he stopped and backed up to where the accident occurred "that he saw a horse go by with the harness on and he knew he had done some dirt and came back up there to see what it was; that he was trying to get down to Junction City out of the six o'clock passenger train's time; that he was running on the six o'clock passenger's time."   This conversation was, according to the witness Read, within two minutes after the accident occurred.   Counsel for appellant insist that it was within forty seconds.   The witness, however, says that

he was about two hundred feet from the crossing when the accident occurred; that after the accident he went to the crossing and could not locate Schmid at the crossing; that it knocked him over the cattle guards and that he could not see deceased for a few minutes after that; that before he started to the crossing he hollowed to a little darkey that the train had hit Schmid and to go up and see what it had done to the old man; that they went up tolerably close to the crossing and could not see him; that he (deceased) wasn't over where the buggy was; that the darky looked over the fence, said "yonder he lies up there on the bank," that the engine, after it struck Schmid, ran down about three hundred yards to the other crossing, stopped and backed up to where they were and where they had this conversation. George Warren, another witness for appellant, says relative to this conversation, that this darky called to him and he went with Read and the darkey to the place of the accident, and that it was five or ten minutes before the conversation occurred; and it was after this witness had so testified that the court excluded this conversation from the consideration of the jury. It is true the engineer did say that he backed up to where the parties were within forty seconds after the accident. But he says that the conversation did not occur then or at all. So the only evidence we have as to when the conversation was had is the evidence of Read and Warren. Warren says that it was five or ten minutes, and Read details facts that occurred between the time of the accident and the conversation that no doubt convinced the court that Warren was nearer right than Read, and the court taking into consideration all the evidence relative to the time which had elapsed was of the opinion that it was not part of the res gestae and, therefore, excluded it; and we are not inclined to disagree with him. However, had it been admissible, we cannot understand how its rejection was prejudicial to appellant. The verdict was in his favor, and we must presume that the jury fixed what they thought to be a just compensation under the instructions of the court which we have approved, and compensatory damages was all he was entitled to. Counsel for appellant says its rejection "enabled appellee to hide in part the willfully gross negligence of the engineer and his crew in killing deceased." If, however, there was no gross negligence, there was none to hide. Construing this language the

·most favorable way for appellant, the only effect it could have had on the jury would have been to inflame their minds and cause them to award punitive damages, and this we have decided appellant is not entitled to. Appellant points to no evidence that was admitted that he claims to be incompetent and we have been unable to find any in the record prejudicial to him.

We see no reason for disturbing the finding of the jury; and the judgment is, therefore, affirmed.

Whole court sitting, Judge Nunn dissenting.